**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

THOMAS M. TULLY,
        Petitioner,

v.                                              Civil Action No. 3:10cv299

GENE JOHNSON,
        Respondent.

## MEMORANDUM OPINION

Thomas M. Tully ("Tully"), a Virginia prisoner, filed a petition for a writ of habeas corpus challenging his convictions in the Circuit Court for the County of Frederick ("Circuit Court") for breaking and entering with intent to commit assault and battery, malicious wounding, misdemeanor assault and battery, and two counts of maliciously causing bodily injury by caustic substance. (ECF No. 1.) By Memorandum Opinion and Order entered on February 23, 2011, the Court dismissed the action. *Tully v. Johnson*, 3:10cv299, 2011 WL 744644, at *11 (E.D. Va. Feb. 23, 2011). The Court found that all of Tully's claims for relief were procedurally defaulted. *Id.* at *6, *11. The United States Court of Appeals for the Fourth Circuit denied Tully a certificate of appealability and dismissed his appeal. *Tully v. Johnson*, 445 F. App'x 713, 713 (4th Cir. 2011). Thereafter, this Court denied multiple motions for relief under Federal Rule of Civil Procedure 60(b) filed by Tully. *See, e.g., Tully v. Johnson*, No. 3:10cv299, 2012 WL 1259102, at *1 (E.D. Va. Apr. 13, 2012); *Tully v. Johnson*, No. 3:10cv299, 2012 WL 113861, at *1 (E.D. Va. Jan. 13, 2012).

On September 16, 2021, the Court received Tully's latest request for relief under Rule 60(b). ("Rule 60(b)(6) Motion," ECF No. 70.) Tully contends that he is entitled to relief under Rule 60(b)(6) because he is actually innocent of the crimes of which he was convicted. (ECF No.

70, at 10.)  In support of this assertion, Tully submits an affidavit from Lisa Hoskins, one of the victims of his crimes, wherein she asserts that she falsely stated that Tully did not live with her at the time of the crimes.  (ECF No. 70-1, at 2.)

## I. GENERAL PARAMETERS FOR RULE 60(B)(6) RELIEF

Federal Rule of Civil Procedure 60(b) allows a court to "relieve a party . . . from a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b).  Such relief is an "extraordinary remedy" requiring a showing of "exceptional circumstances." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (citing *Ackermann v. United States*, 340 U.S. 193, 202 (1950)).  The party seeking relief under Rule 60(b) "must make a threshold showing of *timeliness*, 'a meritorious claim or defense,' and lack of unfair prejudice to the opposing party." *Coleman v. Jabe*, 633 F. App'x. 119, 120 (4th Cir. 2016) (emphasis added) (quoting *Aikens v. Ingram*, 652 F.3d 496, 501 (4th Cir. 2011)).  A party must also demonstrate "exceptional circumstances." *Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (quoting *Werner v. Carbo*, 731 F.2d 204, 207 (4th Cir. 1984)).  After a party satisfies this threshold showing, "he [or she] then must satisfy one of the six specific sections of Rule 60(b)." *Id.* (quoting *Werner*, 731 F.2d at 207).

Federal Rule of Civil Procedure 60(b)(6) permits a court to grant relief for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).  Rule 60(b)(6) requires that the movant "show 'extraordinary circumstances' justifying the reopening of a final judgment." *Shanklin v. Seals*, No. 3:07cv319, 2011 WL 2470119, at *2 (E.D. Va. June 21, 2011) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005)).

## II. ANALYSIS

### A. *Tully's Rule 60(b)(6) Motion Is Not Timely*

Under Federal Rule of Civil Procedure 60(c)(1), Tully was required to file his motion within a reasonable time after the entry of the February 23, 2021 Memorandum Opinion and Order. Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time–and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding."). Tully's Rule 60(b)(6) Motion, filed over ten years after the entry of the challenged judgment, without any explanation for that lapse of time, was not filed in a reasonable time. *See McLawhorn v. John W. Daniel & Co., Inc.*, 924 F.2d 535, 538 (4th Cir. 1991) ("We have held on several occasions that a Rule 60(b) motion is not timely brought when it is made three to four months after the original judgment and no valid reason is given for the delay." (citing *Cent. Operating Co. v. Utility Workers of Am.*, 491 F.2d 245 (4th Cir. 1974); *Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249 (4th Cir. 1967))).

### B. *Tully's Rule 60(b)(6) Motion Lacks Merit*

Second, Tully has not demonstrated any extraordinary circumstance that would warrant Rule 60(b)(6) relief. "Claims of actual innocence, whether presented as freestanding ones or merely as gateways to excuse a procedural default, should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (internal citations omitted). Here, the Court reviews Tully's arguments under the more lenient standard for gateway actual innocence claims because subscribing to Tully's actual innocence claim would permit the Court to consider the merits of his otherwise defaulted claims.

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—

that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09cv659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)). Moreover, actual innocence means factual innocence and not just legal insufficiency. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

In dismissing Tully's original § 2254 Petition, the Court evaluated and rejected Tully's assertion of actual innocence. *See Tully v. Johnson*, No. 3:10cv299, 2011 WL 744644, at *7 (E.D. Va. Feb. 23, 2011). To provide the necessary context, it is appropriate to recite the evidence of Tully's guilt with respect to the charges of breaking and entering with intent to commit assault and battery, malicious wounding, misdemeanor assault and battery, and two counts of maliciously causing bodily injury by caustic substance prior to turning to Tully's sparse new evidence of innocence. The Court previously summarized that evidence as follows:

### 1. *Hoskins's Testimony*

Lisa Hoskins testified that she had two children with Tully: Courtney and Channing Tully. On March 5, 2006, she lived in a trailer park in Frederick County, Virginia. Hoskins had ended her romantic involvement with Tully in November of 2005. At that point, Hoskins took back Tully's key to her trailer, and Tully's mother removed Tully's personal items from Hoskins's trailer.[1]

After Hoskins ended her relationship with Tully, she became romantically involved with Gary Snoby, who worked with Tully. On Friday, March 3, 2006, Tully began calling Hoskins. Hoskins received roughly twenty phone calls from Tully between Friday, March 3, 2006 and Sunday, March 5, 2006. Tully had found out that Hoskins was seeing Snoby and Tully was angry.

On Sunday, March 5, 2006, at 7:00 a.m., Hoskins was awakened by Tully pounding on and kicking the door to her trailer. Hoskins called 911. Tully broke the window in Hoskins's trailer and began to crawl through the window of the trailer. Hoskins fled to a neighboring trailer owned by Scott Baldwin and asked to be let in. Tully appeared behind Hoskins, pushed her to the ground, and kicked her three or four times.[2] Hoskins begged Tully to stop. Hoskins's thirteen-year old daughter Courtney placed her body on top of Hoskins to prevent Tully from kicking Hoskins. Tully asked Hoskins, "Why did you do this to me, Lisa?" (Tr. at 331.) Tully then sprayed Hoskins in the face with some substance. Hoskins testified the spray hurt very badly. Tully also dragged Hoskins around by her hair.

At this point, the police arrived. Hoskins talked to police and then went into her trailer to rinse her eyes. An ambulance took Hoskins to the hospital. Hoskins testified that the pain in her back lasted approximately six weeks. Hoskins swore that she did not have a weapon or fight back. Hoskins swore that when she arrived at the hospital, the back of her head was very sore, and handfuls of her hair fell out when she ran her hand through her hair. Immediately prior to this incident, hair had not come so easily detached from her head. The prosecution introduced into evidence a picture of Hoskins's head, which showed a missing patch of hair. Additionally, the prosecution produced a handful of Hoskins's hair that had come detached from her head on the date of the assault.

### 2. *Courtney's Testimony*

Courtney testified that Tully had been "officially kicked out" of the trailer around November and/or December of 2005. (Tr. at 426.) Courtney confirmed that the majority of Tully's personal items had been removed from the trailer. Courtney

---

[1] The prosecution introduced this evidence to support the breaking and entering charge and demonstrate that Tully did not have permission to be inside Hoskins's trailer.

[2] Hoskins was five feet and one inch tall and weighed 110 pounds. (Tr. at 321.) Tully was six feet and two inches tall and weighed 180 pounds. (Tr. at 715.)

testified Tully banged on the door, then broke out the window and chased her and her mom through the house to the neighbor's home. Upon arriving at the neighbor's home, Tully pushed Hoskins off the porch and into the yard. Tully then began kicking Hoskins "really hard" as she lay in the yard. (Tr. at 431.) Courtney tried to cover her mom with her body. Tully then sprayed Courtney and her mom with mace or some other substance. After Tully got Courtney off of her mom, Tully pulled Hoskins's hair.

After the incident, Courtney's eyes, neck, and finger hurt. When the police arrived, Courtney told them what happened and washed her eyes. Courtney went to the hospital where medical personnel put a wash cloth on her neck and shampoo on the burning on her neck. The Commonwealth introduced a picture of Courtney from after the attack. In the picture, her eyes are red and there is a red substance on her shirt. Courtney testified that her mother did not have a knife and never fought back.

### 3. *Candace Creswell's Testimony*

Candace Creswell was at Hoskins's trailer when Tully arrived and began kicking the door. Creswell testified that she saw Tully in the trailer after the window broke. Creswell testified that after she, Hoskins, and Courtney fled to the nearby trailer, Tully caught Hoskins and threw her down. Creswell testified that Tully then dragged Hoskins by her hair through the grass and repeatedly kicked her really hard.

### 4. *The Baldwins' Testimony*

Scott Baldwin, the owner of the trailer to which Hoskins fled, confirmed the above accounts. Scott Baldwin testified that he observed Tully repeatedly kicking Hoskins and Courtney very hard. Hoskins was not fighting back.

Brandon Baldwin, Scott Baldwin's son, also observed the incident. Brandon testified that he saw Tully repeatedly kick Hoskins and Courtney "like a football" as they were on the ground. (Tr. at 480.) Brandon also testified that he saw Tully spray Courtney and Hoskins with mace in their eyes from about a foot away.

### 5. *Other Testimony and Evidence*

When Sergeant Tokash of Frederick County Police arrived on the scene, Hoskins and Courtney ran towards him crying. Hoskins's face was really red. Courtney said her face was "burning." (Tr. at 518.) Sergeant Tokash took pictures of Hoskins and Courtney which were admitted into evidence. Sergeant Tokash also recovered a can of pepper spray from Scott Baldwin's property. Scott Baldwin testified that the pepper spray had not been on his property before this incident.

Carol O'Neil, a forensic toxicologist, testified that pepper spray, like that recovered from the scene, was a caustic substance that can cause a burning sensation.

The prosecution also played recordings of phone calls Tully made from jail wherein he admitted that he slammed Hoskins to the ground and kicked her a couple of times.

### 6. *The Defense's Evidence*

The defense's evidence essentially consisted of Tully's mother claiming that he still lived at Hoskins's residence and Tully's own testimony.

Tully testified that he still lived with Hoskins in March of 2006. Nevertheless, because he had been out drinking on March 4, 2006, he spent the night at a friend's house. When he woke up the next morning, he stopped by the trailer he shared with Hoskins to pick up some of his tools. Tully claimed he used his key to open the door to the trailer. Tully testified that Hoskins had gotten mad when she saw him and started yelling at him and cut him with a knife on his hand. Tully claims he was going to leave with his tools, but Hoskins kept yelling at him. Tully then went over to Hoskins, who was now on the Baldwin's porch, and tried to calm her down. Tully claims he only pushed Hoskins down when she came at him. When Courtney tried to intervene in the argument between Tully and Hoskins, Tully pushed Courtney down. Tully denied kicking Hoskins, breaking the window, or possessing pepper spray.

Tully's testimony simply was not credible. Tully could not produce a key for Hoskins's trailer.[3] Moreover, Tully's testimony was largely inconsistent with the story he had provided Sergeant Tokash on March 5, 2006. Tully had told Sergeant Tokash that he had been at Hoskins's trailer to deliver a check for child support. Tully also had admitted to Sergeant Tokash that he broke the trailer window. Moreover, although Tully denied that he kicked Hoskins, Tully was unable to provide a plausible explanation for the recorded conversations which reflected him saying that he had kicked Hoskins.

Additionally, on rebuttal, the prosecution called two witnesses who further refuted Tully's suggestion that he resided at Hoskins's trailer in March of 2006. Officer Tim Shraff of the Winchester Police Department testified that on February 14, 2006, Tully had told him that he lived at "116, Number Two, Monmouth Street Winchester, Virginia." (Tr. at 806.) Additionally, Christina Laws testified that, on February 15, 2006, Tully had told her that he lived at 116 East Monmouth Street in Winchester with Deanna White.

### 7. *Tully's New Evidence of Innocence*

Tully claims, "The evidence of the Emergency Room examination would have shown that the alleged victim[s'] eyes were *never* sprayed with or affected by any caustic substance." (§ 2254 Pet. ¶ 113.) Tully then directs the Court to the emergency room records for Hoskins and Courtney. (§ 2254 Pet. Ex. 33, 34.) Tully notes that the

---

[3] Tully claimed that his mom had given the key back to Hoskins after he was arrested.

records do not indicate Hoskins or Courtney complained of eye problems and that Courtney specifically denied any problems besides an injured finger and redness on her forearm. Given the overwhelming evidence of Tully's guilt, these medical records fall far short of demonstrating his innocence.[4] Hoskins and Courtney's testimony that Tully sprayed them with a caustic substance was confirmed by Brandon Baldwin and Candace Creswell. Additionally, this testimony was corroborated by the pictures of Courtney and the discovery of a can of pepper spray at the scene. The absence of any notation in the medical records reflecting that Courtney or Hoskins complained about eye problems is explained by the fact they had rinsed their eyes prior to being transported to hospital. Moreover, Courtney's medical records reflect that Courtney complained that she was "pepper spray[ed]" and "now has rash." (§ 2254 Pet. Ex. 34 at 1.) Tully fails to demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt'" on the two counts of maliciously causing bodily injury by caustic substance. *House*, 547 U.S. at 536–37 (quoting *Schulp*, 513 U.S. at 327). Accordingly, Tully's suggestion that actual innocence excuses his default is rejected.

*Id.* at *8–10 (all alterations, besides footnote numbers and formatting, in original).

In support of his present assertion of actual innocence, Tully submits an affidavit from Lisa Hoskins.[5] Hoskins states in pertinent part:

I voluntarily provide my statement in this affidavit to right the wrongful actions I committed at the hands of being coerced by Assistant Commonwealth Attorney Nicole M. Spicer and Melissa Rice, Director of the Victim/Witness Protection Program.

On March 5, 2006, Thomas Tully was arrested because of a domestic dispute between him and I. At that time Thomas Tully and I lived together at 225–49 Indian Hollow Rd., Winchester, Va. 22603. We resided at this residence with our two children.

At the time of Thomas Tully being arrested, I was very angry and upset with him. I gave a false statement to the police that Thomas Tully did not live with me and our children. The fact is, Thomas did live with me and our children.

In April 2006, I contacted Thomas Tully's attorney to help me have the charges dismissed against Thomas Tully. At that time, his lawyer never responded to my

---

[4] The Court notes the evidence of Tully's guilt with respect to all of the charges was overwhelming.

[5] Tully also rehashes his arguments that the medical records reflect that he did not spray the victims with a caustic substance. This argument lacks merit for the reasons previously stated and will not be considered further.

8

call. I wanted this attorney to help me because Assistant Commonwealth Attorney Nicole M. Spicer had no plans on dismissing these charges.

In May 2006, Assistant Commonwealth Attorney Nicole M. Spicer and Director Melissa Rice, of the Victim/Witness Protection Program, had me come to the Frederick County Commonwealth's Attorney's Office and listen to some alleged telephone calls that they told me were telephone calls they obtained from the Winchester, Va. Jail. They told me these telephone calls are of Thomas Tully talking to his Mother, Deanna White.

These telephone calls contained nasty remarks towards me, that were allegedly made by Thomas Tully and his mother. After hearing them, and speaking with Assistant Commonwealth Attorney Nicole M. Spicer and Director Melissa Rice, they made me furious and helped convince me to go into court and testify that Thomas Tully did not live with me and our children at the time of his arrest. Had it not been for Nicole M. Spicer and Melissa Rice having me listen to those telephone conversations, I would have had the charges dismissed against Thomas Tully in April. 2006.

My statement that Thomas Tully did not live with me and our children is a false statement given under coercion. I now state for the record, and to correct my false statement given, on March 5, 2006, Thomas Tully did reside with me and our children at 225–49. Indian Hollow Rd., Winchester, Virginia 22603.

(ECF No. 70-1, ¶¶ 3–9.)

To be frank, the Court does not find Hoskins's sparse recantation of her prior testimony that Tully did not live with her at the time of the crimes "trustworthy," and her testimony fails to constitute "new reliable evidence" of Tully's innocence. *Schlup*, 513 U.S. at 324; *United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are looked upon with the utmost suspicion.") (internal quotation marks omitted; citation omitted). To accept such a commonplace and threadbare recantation would ignore the Supreme Court's admonition that the quality of evidence necessary to support a claim of actual innocence "is obviously unavailable in the vast majority of cases." *Schlup*, 513 U.S. at 324; *see Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (emphasizing that new reliable evidence of innocence is a "rarity"). Moreover, overwhelming evidence reflected that Tully did not live with Hoskins at the times of the crimes.

9

Hoskins testified that Tully did not live with her at the time of the crimes.  Courtney confirmed that Tully had been kicked out of the trailer.  Hoskins was romantically involved with someone else.  Tully did not have a key to the trailer and had to crawl through a window.  Officer Tim Shraff of the Winchester Police Department testified that on February 14, 2006, Tully told him that he lived at 116, Number Two, Monmouth Street Winchester, Virginia. Additionally, Christina Laws testified that, on February 15, 2006, Tully told her that he lived at 116 East Monmouth Street in Winchester with Deanna White.  Taken together, all the evidence provides compelling proof that Tully did not have permission to enter the trailer on the date of the assault and entered the trailer with the intent to assault and injure Hoskins.  Tully simply fails to demonstrate, in light Hoskin's stale recantation, that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Sharpe,* 593 F.3d at 377 (quoting *Schlup,* 513 U.S. at 327–28).

Accordingly, Tully's Rule 60(b)(6) Motion, (ECF No. 70), will be DENIED.  Tully's Motion for Appointment of Counsel, (ECF No. 71), and Declaration for Entry of Default, (ECF No. 72), will also be DENIED.  A certificate of appealability will be DENIED.

An appropriate Order will accompany this Memorandum Opinion.

It is so ORDERED.

Date: 16 March 2022
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge

10